UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

AUSTIN BABB,                                          :

                         Plaintiff,          :          **COMPLAINT**

           - against -                  :          No. 21-cv-8655

THE CITY OF NEW YORK and STEVEN        :
SMITH, in his individual and official
capacities,                                          :          Jury Trial Demanded

                 Defendants.     :
---------------------------------------------------------x

     Plaintiff AUSTIN BABB, by his attorneys, the LAW OFFICES OF JOEL B. RUDIN,

P.C., respectfully alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

     1.      This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and New York

State law, seeking monetary damages for the Plaintiff, AUSTIN BABB, due to his unlawful

criminal prosecution and conviction for attempted murder in The Bronx, New York, his pretrial

detention and post-conviction imprisonment totaling nine and one-half years, and his additional

consequential damages.

     2.      This lawsuit seeks to hold Defendant Steven M. Smith, a detective in the New

York City Police Department ("NYPD"), individually liable for malicious prosecution, evidence

fabrication, and suppression of *Brady* material, in violation of Plaintiff's Fourth, Fifth, Sixth,

Eighth, and Fourteenth Amendment rights.

     3.      In addition, it seeks to hold the Defendant City of New York ("City") responsible

because the unlawful actions of Defendant Smith and prosecutors in the Bronx County District

Attorney's Office ("DA's Office" or "BXDA") foreseeably resulted from the deliberate indifference of policymakers in the NYPD and BXDA—both New York City agencies—to such constitutional violations.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

4.      This action arises under 42 U.S.C. §§ 1983 and 1988 and under the common law of the State of New York.

5.      The acts and omissions giving rise to this complaint occurred in Bronx County.

6.      Plaintiff's damages exceed $25,000.

7.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and under the principles of pendent jurisdiction.

8.      Venue is proper under 28 U.S.C. § 1391.

9.      This action has been commenced within the applicable period for each claim.

10.     On October 20, 2020, Plaintiff served the City of New York timely notice of the present claims, in accordance with N.Y. Gen. Mun. Law § 50-e.

11.     The City did not schedule, and therefore waived its right to, an examination under N.Y. Gen. Mun. Law § 50-h.

12.     Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

13.     Plaintiff AUSTIN BABB is a citizen and resident of the State of New York and of the United States. He resides within the Southern District of New York.

14.     Defendant STEVEN SMITH, Shield No. 6044, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

15.     Defendant CITY OF NEW YORK is a municipal corporation of the State of New York and is a resident of the Southern District of New York.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The shooting

16.     On August 7, 2010, at approximately 2:45 a.m., someone fired gunshots in Apartment 6E at 1454 Grand Concourse in the Bronx.

17.     The apartment was on the sixth floor of the building.

18.     A party was taking place in the apartment.

19.     Plaintiff Austin Babb was not at the party.

20.     Nineteen-year-old Demetrius Jones was struck by the gunfire and died as a result.

21.     Ariel Hall was also struck by the gunfire but survived.

22.     Around the same time, someone fired gunshots in the hallway outside the apartment, non-fatally wounding Daquan Fletcher and Brandi Garcia-Suli.

23.     Demetrius Jones's mother, Vachelle Jones, lived in an apartment on the third floor of the same building.

24.     Upon hearing gunshots, she opened her apartment door and saw a young man running down the stairs.

25.     She saw this person's face.

26.     She then looked out a window of her apartment.

27.     She saw the same young man run out of the building, waving a gun.

28.     She saw him jump on a bicycle, stumble with it, jump off it, and run away.

**Defendant Smith is assigned as the lead detective and
conducts an initial investigation**

29.     Defendant Steven Smith was assigned as the lead detective in the investigation of the shooting.

30.     Pursuant to NYPD policy and practice, as the detective in charge, he was responsible to make sure that all relevant information learned during the course of the investigation, including information bearing on the identity of the perpetrator, was documented.

31.     Less than five hours after the shooting, Smith interviewed Justina Willis, who had attended the party.

32.     Willis told Smith that a person nicknamed "Zebb Live" was the shooter.

33.     Willis identified Zebb Live in a photograph shown to her by the police.

34.     "Zebb Live" is not Plaintiff, and Smith knew this.

35.     Smith did not document Willis's identification of Zebb Live.

36.     Another detective interviewed partygoer Lavasia Jones.

37.     Lavasia Jones told this detective that the shooter was "bald."

38.     The detective recorded this detail in a police report.

39.     When Defendant Smith observed Plaintiff within two days of the shooting, Plaintiff had a full head of hair.

40.     Within hours of the shooting, police recovered the bicycle on which Vachelle Jones had seen the man with the gun try to escape.

41.     On August 9, 2010, Defendant Smith was informed that three fingerprints or palm prints were recovered from the bicycle: one matched a person named Wade Quiah, a second matched Plaintiff, and a third was from an unknown person.

4

42.     The same day, Smith showed Justina Willis a photo array containing a photo of Plaintiff.

43.     Willis told Smith that she did not recognize the shooter in the photo array.

44.     Although this statement tended to prove Plaintiff was not the shooter, Smith, knowing Plaintiff was a suspect, did not, as required by police policy and practice, document the result of the identification procedure in a DD5 report.

45.     Defendant Smith also showed a photo array containing Plaintiff's photograph to four other eyewitnesses: Brandi Garcia-Suli, Ariel Hall, Vachelle Jones, and Quasean James.

46.     All four eyewitnesses told Smith that they did not recognize the shooter in the photo array.

47.     Smith did not document any of their statements, which also tended to prove Plaintiff was not the shooter.

48.     He never disclosed to the prosecution the results of the photo identification procedures conducted with these four witnesses, in which they did not recognize Plaintiff as the shooter.

49.     It was only midway through Plaintiff's trial—after Garcia-Suli, Hall, and Vachelle Jones had testified that they were shown photographs and made no identification—that Smith disclosed that he had shown a photo array containing Plaintiff's photo to Justina Willis, and that she had also failed to recognize Plaintiff as the shooter.

50.     On August 9, 2010, Defendant Smith also showed a photo array containing Plaintiff's picture to eyewitness Corey Collins.

51.     Collins had described the shooter to police as clean shaven.

52.     Other witnesses had described the shooter as a teenager possibly as young as 16 years old.

53.     NYPD procedures required that photo arrays be prepared in a non-suggestive manner so that no individual stands out—especially the suspect.

54.     Contrary to this procedure, Smith prepared a photo array that obviously suggested Plaintiff as the suspect, in that, among other things:

    a.     Plaintiff's photograph stood out because his face looked as if a spotlight was being shined on it, whereas, in the other five photographs, the lighting was unremarkable;

    b.     Plaintiff appeared substantially younger and thinner than the fillers;

    c.     The photograph of Plaintiff in the array was taken when he was 15 years old, even though eyewitnesses described the shooter as a teenager but Plaintiff, at the time of the shooting, was 20; and

    d.     Consistent with Collins's description of the shooter, Plaintiff's photo showed him without facial hair whereas, at the time of the shooting, Plaintiff had a substantial beard.

55.     Smith knew that Collins was intoxicated on alcohol and high on drugs when Collins witnessed the shooting.

56.     Smith also knew that numerous witnesses had described the apartment where the party was held as very dark at the time of the shooting.

57.     Smith documented Collins's selection of Plaintiff as the shooter (in contrast to his failure to document the non-identifications by the other witnesses).

58.     Smith's report was misleading with regard to the reliability of the identification in that it failed to describe the suggestive manner in which the photographic array was conducted, Collins's condition at the time of his observation of the shooting, and the dark lighting conditions at the time of Collins's observation of the shooting.

6

59.     After eliciting Collins's unreliable identification of Plaintiff, Smith submitted an I-Card requesting that Plaintiff be arrested as the perpetrator of the shooting.

60.     Relying on this I-Card, other officers arrested Plaintiff on August 9, 2010.

61.     Smith interviewed Plaintiff the same day.

62.     Plaintiff denied having anything to do with the shooting.

63.     On August 11, 2010, Smith had Corey Collins view Plaintiff in a lineup.

64.     Collins's identification of Plaintiff was virtually a foregone conclusion as Collins had just selected Plaintiff from an extraordinarily suggestive photo array.

65.     Contrary to NYPD policy, instead of letting Plaintiff select his own position in the lineup, Smith brought Plaintiff to a lineup room where seats 1-5 were already occupied, so that Plaintiff had no choice but to sit in seat 6.

66.     Smith documented in two police reports that Collins had identified Plaintiff, without anywhere noting the suggestiveness of the process.

67.     After having led Collins to identify Plaintiff, Smith informed Collins that he had identified the police suspect, thereby improperly reinforcing Collins's level of certainty in his selection.

68.     On August 11, 2010, other detectives interviewed Wade Quiah.

69.     Quiah admitted that he was present at the party where the shooting had occurred.

70.     Quiah further admitted that "when he left the party he crashed his bicycle" on the street outside the apartment building.

71.     As noted above, the murder victim's mother had seen a person get on the bicycle with a gun and then flee on foot, just as Quiah admitted he had done.

72.     On or about August 25, 2010, a grand jury indicted Plaintiff on one count of second-degree murder for the fatal shooting of Demetrius Jones; one count of first-degree manslaughter for the fatal shooting of Demetrius Jones; three counts of attempted second-degree murder for the nonfatal shootings of Brandi Garcia-Suli, Ariel Hall, and Daquan Fletcher; three counts of first-degree assault for the nonfatal shootings of Brandi Garcia-Suli, Ariel Hall, and Daquan Fletcher; and two counts of second-degree criminal possession of a weapon.

73.     Before the grand jury returned its indictment, neither Smith nor the prosecutor informed the grand jury or the defense that:

      a.     Justina Willis had identified the shooter as Zebb Live;

      b.     Five eyewitnesses, including Willis, had viewed a photo array containing Plaintiff's photograph and did not recognize Plaintiff as the shooter;

      c.     The young man whom Vachelle Jones testified had run down the stairs and out of the building, jumped on a bicycle, stumbled, and then run off, all while waving a gun, was Wade Quiah, by Quiah's own admission to police;

      d.     Eyewitnesses had described the shooter as bald, clean shaven, and a teenager as young as 16, while Plaintiff, upon his arrest two days after the shooting, had a full head of hair and a full beard and was 20;

      e.     Corey Collins had been intoxicated and high on drugs when the shooting occurred, which undermined the reliability of his lineup identification of Plaintiff; and

      f.     The lineup identification was unreliable because it followed by just two days a photo array procedure in which Plaintiff's photo stood out as if a spotlight was on it and that was otherwise suggestive.

74.     Plaintiff was remanded at his arraignment and remained in custody for the next nine and one-half years.

### The suppression hearing and trial

75.     A suppression hearing was held on September 9 and 10, 2014.

76.     Plaintiff's trial was conducted from September 16 to November 21, 2014.

77.     Both at the hearing and at trial, an issue was Defendant Smith's handling of the identification procedures he conducted with Corey Collins, and Smith's credibility was important to the outcomes of both proceedings.

78.     Unbeknownst to the defense at the time of Plaintiff's trial, Smith had a history of misconduct known to certain members of the DA's Office.

79.     In 2005, Smith was the lead detective in the investigation of the robbery and shooting of George Peseo in the Bronx.

80.     In that investigation, Smith had used improperly suggestive and coercive means to obtain statements from three eyewitnesses identifying Latisha Johnson and Malisha Blyden as the two female perpetrators of the crime.

81.     After arresting Latisha Johnson, Smith interrogated her and coerced her complete confession.

82.     He then coerced her into identifying two men from photo arrays as her accomplices, and he led shooting victim Peseo to identify them as well.

83.     After charging both women and the other two men, the DA's Office later developed evidence that all of them were completely innocent.

84.     However, before the DA's Office exonerated the two women, they were first convicted at trial and each sentenced to 40 years in prison.

85.     Ultimately, the BXDA identified the actual two female perpetrators.

86.     However, by that time the statute of limitations had run and the women could not be charged with any crimes.

87.     In all, Smith had obtained a false confession from Johnson and ten false identifications from five different eyewitnesses.

88.     Smith's misconduct in the above case occurred and was known to some personnel at the DA's Office before Plaintiff's pretrial suppression hearing concerning the admissibility of the identification evidence and before the use against Plaintiff of such evidence at his trial.

89.     Also, at the time of Plaintiff's trial, Smith had previously been a named defendant in at least two civil rights lawsuits alleging false arrest and evidence fabrication: *Velez v. City of New York*, 04-cv-9281 (S.D.N.Y.) (settled Feb. 9, 2005); and *Darlin v. City of New York*, 02-cv-870 (S.D.N.Y.) (settled Feb. 3, 2002).

90.     Neither of these cases was disclosed to Plaintiff or his counsel during his criminal hearing and his trial.

91.     At trial, as a result of Smith's use of highly suggestive photo and lineup identification procedures, Corey Collins identified Plaintiff in court as the person who had shot Demetrius Jones.

92.     This was the *only* evidence identifying Plaintiff as the shooter, let alone putting him in the shooting's vicinity.

93.     Collins was questioned about his guilty plea, six months before trial, to two B felonies, for which he faced up to 25 years in prison, and multiple misdemeanors, all relating to illegal drugs, and his placement in a diversionary program called TASC.

94.     He was questioned about his arrest, while attending TASC, for a drug-related misdemeanor, and the plea bargain the D.A.'s Office gave him under which he was reinstated to the TASC program.

95.     He was further questioned about his arrest, during jury selection in Plaintiff's trial, for yet another drug-related B felony.

96.     However, based upon the prosecutor's repeated representation that he was "not aware" of any promises or benefits given to Collins in connection with his testimony, the defense did not question Collins about whether he had any such expectation or had received any such promise, either express or implied.

97.     In fact, employees of the BXDA knew or should have known that, based upon Collins's interaction with the DA's Office, Collins did have an understanding and expectation that he had would receive leniency in exchange for his cooperation with the DA's Office in the prosecution of Plaintiff.

98.     Indeed, shortly after Plaintiff's trial was completed, the BXDA agreed to a resolution of Collins's open B felony case under which Collins was restored yet again to the TASC program and yet again received no jail time.

99.     In total, during the period of his cooperation with the DA's Office against Plaintiff, Collins received only one jail sentence, of 45 days, despite being indicted for three separate drug-related B felonies and numerous misdemeanors.

100.     Smith did not disclose to the BXDA, before or during Plaintiff's trial, that he had shown Plaintiff's photograph to Brandi Garcia-Suli, Ariel Hall, Daquan Fletcher, and Quasean James, and none had recognized Plaintiff.

101.     In fact, when evidence of these identification procedures emerged during the trial, Smith falsely denied he had conducted such procedures.

102.     Smith never disclosed that Justina Willis had told police the shooter was Zebb Live and had identified Zebb Live in a photograph.

103.     On the first day of the suppression hearing, the prosecutor disclosed to the defense a page of handwritten notes that contained the following ambiguous note: "Zebblive — Blue sweat shirt (shooter)."

104.     When the prosecutor asked Smith what this note meant, Smith falsely claimed he did not know.

105.     After the defense suppression motion was decided, Justina Willis told a defense investigator that she had told police that Zebb Live was the shooter.

106.     The late or non-disclosure of the above exculpatory evidence deprived defense counsel of the opportunity to investigate the information and to plan a different and potentially more effective defense strategy around it.

107.     On November 21, 2014, the jury found Plaintiff guilty of one count of attempted murder in the second degree for the fatal shooting of Demetrius Jones; three counts of assault in the first degree for the nonfatal shootings of Brandi Garcia-Suli, Ariel Hall, and Daquan Fletcher; and two counts of criminal possession of a weapon in the second degree.

108.     The jury found Plaintiff not guilty of three counts of attempted second-degree murder for the nonfatal shootings of Garcia-Suli, Hall, and Fletcher.

109.     Following Plaintiff's conviction, his attorney brought a motion, pursuant to New York Criminal Procedure Law § 330.30, seeking to vacate Plaintiff's conviction based on, among other grounds, the prosecution's failure to disclose various items of *Brady* material.

110.     Opposing this motion, the BXDA continued to withhold its knowledge about Smith's misconduct in the Johnson/Blyden case, and the court denied the motion.

111.     On May 26, 2015, the court imposed the following prison terms for the six counts of conviction:

a.    Count 1, first-degree murder for the fatal shooting of Demetrius Jones: 24 years to life in prison;

b.    Count 6, first-degree assault for the nonfatal shooting of Ariel Hall: 18 years in prison;

c.    Count 7, first-degree assault for the nonfatal shooting of Brandi Garcia-Suli: 18 years in prison;

d.    Count 8, first-degree assault for the nonfatal shooting of Daquan Fletcher: 24 years in prison;

e.    Count 9, second-degree criminal possession of a weapon: 15 years in prison; and

f.    Count 10, second-degree criminal possession of a weapon: 10 years in prison.

112.    The court ordered that the sentences for counts 1, 7, 9, and 10 run concurrent with each other, and that the sentences for counts 6 and 8 run concurrent with each other but consecutive to the others.

113.    Accordingly, the minimum amount of time that Plaintiff was required to serve in prison under the sentence was 48 years.

### The vacatur of Plaintiff's convictions and dismissal of the indictment

114.    Following an investigation by Plaintiff's new counsel, the Office of the Appellate Defender, and the Conviction Integrity Unit ("CIU") of the BXDA, on February 4, 2020, the two sides jointly moved to vacate Plaintiff's convictions.

115.    In court papers, the CIU wrote that the revelations in the Johnson/Blyden case "unquestionably color the integrity of the investigative work done by Detective Smith in the Babb case."

116.    Specifically, "the reliability of Collins's identification [of Babb] is significantly undercut by the fact that the detective who conducted the identification procedure [i.e., Smith] had previously obtained false identifications in the Johnson/Blyden case."

117.    The CIU also wrote: "the reliability of [the] procedure Smith used to obtain Collins's identification [of Babb] is further undercut by the fact that Smith utterly failed to follow proper procedures in memorializing important witness information" in the Babb investigation, a reference to the Zebb Live identification and the five witnesses who failed to identify Plaintiff's photograph.

118.    The CIU explicitly described the information about Smith's investigation in the Johnson/Blyden case as "*Giglio* material" as to Smith that had been wrongfully withheld from Plaintiff.

119.    *Giglio* material, named after a United States Supreme Court decision, is information that tends to impeach the credibility of a prosecution witness and is required to be timely disclosed to the defense in a criminal case.

120.    The CIU conceded that the prosecution had failed to disclose this information to Plaintiff and his defense lawyer.

121.    The CIU also noted additional evidence it believed undercut the reliability of the guilty verdict against Plaintiff, including DNA evidence on the bicycle that matched another partygoer, Christopher Nelson, whom witnesses had seen at the building on the night of the party and who resembled Plaintiff; newly obtained statements by partygoer Anthony Oliver that contradicted Corey Collins's trial testimony that he had recognized Plaintiff on the night of the shooting from seeing him on a previous occasion; and the evidence concerning Wade Quiah.

122. On behalf of the BXDA, the CIU concluded, in moving to vacate the conviction, that it "no longer ha[d] confidence that the conviction is correct."

123. The court granted the motion on February 6, 2020.

124. Plaintiff was released from custody on February 8, 2020, but still remained under prosecution and constrained to appear in court for any court dates.

125. On the DA's consent, the court dismissed the indictment against Plaintiff on July 24, 2020.

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983. Malicious prosecution in violation of the Fourth, Fifth, and Fourteenth Amendments. Defendant Smith.**

126. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

127. Defendant Smith, individually and in concert with others, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff without probable cause to believe Plaintiff was guilty of any crime or could be successfully prosecuted, and caused him to be deprived of his liberty, in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

128. The proceedings terminated in Plaintiff's favor in a manner indicative of his innocence.

129. By virtue of the foregoing, Defendant Smith is liable for his violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resultant injuries.

## SECOND CAUSE OF ACTION

**State-law malicious prosecution. Defendants Smith and City of New York.**

130.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

131.    By virtue of the foregoing, Defendant Smith is liable to Plaintiff for malicious prosecution under the common law of the State of New York.

132.    Defendant City of New York is liable for Plaintiff's malicious prosecution under the principle of *respondeat superior*.

## THIRD CAUSE OF ACTION

**42 U.S.C. § 1983. Unreasonable seizure under the Fourth Amendment, and denial of due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments, due to the manufacturing of false or misleading evidence. Defendant Smith.**

133.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

134.    Defendant Smith, acting individually and/or in concert with others, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to manufacture Corey Collins's false identifications of Plaintiff—in a photo array, in a lineup, and at trial—and other reports and evidence that were false or misleading, or from which material information bearing upon Plaintiff's innocence had been deliberately omitted (collectively, "the manufactured evidence").

135.    Smith forwarded the manufactured evidence to prosecutors for use against Plaintiff during a criminal prosecution.

16

136.    Smith knew the manufactured evidence would be likely to influence a jury's decision at trial.

137.    As a result of Smith's forwarding of the manufactured evidence to BXDA prosecutors, the latter initiated a criminal prosecution of Plaintiff and he lost his liberty.

138.    Smith's misconduct violated Plaintiff's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process and a fair trial, as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

139.    The above misconduct was outrageous and shocking to the conscience.

140.    By virtue of the foregoing, Defendant Smith is liable for his violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resultant injuries.

### FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983. Unreasonable seizure under the Fourth Amendment, and denial of due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments, due to the pretrial withholding of exculpatory evidence likely to result in Plaintiff's release from custody ("*Russo* Claim"). Defendant Smith.**

141.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

142.    Defendant Smith knew that Plaintiff's prosecution, including Plaintiff's pretrial detention on murder and related charges in lieu of bail, was based upon a slim reed: Corey Collins's unreliable out-of-court identifications of Plaintiff under highly suggestive circumstances.

143.    Smith also knew or should have known that, under New York law, the strength of the prosecution's case was a significant bail factor and that the court likely would have released

Plaintiff on a reasonable bail had it known of the powerful evidence of Plaintiff's likely innocence—including the highly suggestive circumstances of Collins's out-of-court identifications of Plaintiff, Justina Willis's identification of Zebb Live as the shooter, and five eyewitnesses' statements that they did not recognize the shooter in a photo array that contained Plaintiff's photograph.

144.    Yet Smith unconscionably withheld this exculpatory information from the BXDA, the court, and the defense.

145.    This conduct was shocking to the conscience.

146.    It violated Plaintiff's constitutional rights to be free of unlawful or unreasonable seizure under the Fourth and Fourteenth Amendments, to reasonable bail under the Eighth and Fourteenth Amendments, and to due process of law under the Fifth and Fourteenth Amendments.

147.    By virtue of the foregoing, Defendant Smith is liable for his violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resultant injuries.

### FIFTH CAUSE OF ACTION

**42 U.S.C. § 1983. Denial of due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments by withholding evidence favorable to the defense ("*Brady* Claim"). Defendant Smith.**

148.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

149.    At all relevant times, Plaintiff had a clearly-established right—under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; *Brady v. Maryland*, 363 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); and their progeny—to timely disclosure by the prosecution of all material information that tended to show his innocence or that impeached the credibility of the prosecution's witnesses against him.

150.     In order to safeguard this right, police officers, including Defendant Smith, had an obligation to timely disclose all potential *Brady* and *Giglio* evidence and information to the prosecution so that it could make the requisite disclosure to the defense and the defense could investigate the information and make use of it at trial.

151.     Smith violated this obligation by failing to timely disclose to the prosecutor in charge of Plaintiff's criminal prosecution various items of *Brady* and/or *Giglio* material, including but not limited to:

<div style="margin-left:2em">

a.     Smith's misconduct in the Johnson/Blyden case and the BXDA's decision to dismiss charges against three suspects against whom Smith had caused false evidence to be manufactured, which information Smith knew the assigned trial prosecutor in Plaintiff's case either did not or might not know about;

b.     The two lawsuits, filed in court before Plaintiff's trial, in which Smith had been credibly accused of false arrest and evidence fabrication;

c.     The five photo identification procedures Smith had conducted in which eyewitnesses did not recognize Plaintiff as the shooter; and

d.     Justina Willis's identification of an alternative suspect, Zebb Live.

</div>

152.     This information that Smith withheld from the prosecutor, and thus from the defense—either completely or until it was too late for the defense to make effective use of it at the pretrial hearing and at the trial—was favorable to the defense.

153.     It was material to the outcome of the pretrial hearing and of the trial at which Plaintiff was convicted.

154.     In withholding the aforementioned information favorable to Plaintiff, Smith acted deliberately, intentionally, willfully, recklessly, negligently, and/or with deliberate indifference to Plaintiff's constitutional right to due process and a fair trial or to the effect of such misconduct upon Plaintiff's constitutional rights.

155.     But for Smith's withholding of information favorable to Plaintiff, there is a reasonable likelihood that Plaintiff would have received a more favorable outcome to his trial.

156.     By virtue of the foregoing, Defendant Smith is liable for his violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resultant injuries.

## SIXTH CAUSE OF ACTION

**42 U.S.C. § 1983 and *Monell*. Municipal liability for the conduct of employees of the NYPD. Defendant City of New York.**

157.     Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

158.     The Police Commissioner and police officers employed by the NYPD are agents and employees of Defendant City of New York.

159.     Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner or his authorized delegates, during all times relevant to this Complaint, had final responsibility for training, instructing, supervising, and disciplining police officers and other employees of the NYPD with respect to the investigation and prosecution of criminal matters.

160.     The particular areas in which the Police Commissioner or his authorized delegates were responsible for training, instructing, supervising, and disciplining police officers and other employees of the NYPD included but were not limited to:

       a.    the constitutional obligation, pursuant to the Fourth, Fifth, and Fourteenth Amendments to the Constitution, not to initiate or continue a prosecution, and to cause a criminal defendant's deprivation of liberty, without probable cause;

       b.    the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, not to fabricate evidence, including false or unreliable identifications and false or materially misleading or incomplete

reports, for use against criminal suspects and defendants in criminal prosecutions and trials;

c.    the constitutional obligation, pursuant to the Fifth, Sixth, and Fourteenth Amendments, to make timely disclosure of exculpatory or impeachment evidence to the prosecution for disclosure in turn to a criminal defendant for use during pretrial proceedings and at trial; and

d.    the constitutional obligation not to give false or misleading testimony.

161.    During all times material to this complaint, the City, through its policymaking officials in the NYPD, owed a duty to the public at large and to Plaintiff to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by NYPD employees that would result in the violation of the above-mentioned constitutional obligations.

162.    These policymakers knowingly and intentionally breached, or were deliberately indifferent to, this duty.

163.    Furthermore, these policymakers created substantial incentives for their employees to commit the above-described constitutional violations, by pressuring police officers to close cases through arrests, indictments, and convictions.

164.    The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees) were implemented or tolerated by policymaking officials for Defendant City— including but not limited to the Police Commissioner—who knew, or should have known:

a.    to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation of criminal cases;

b.    that such issues present NYPD employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

c.    that NYPD employees facing such issues have strong incentives to make the wrong choices, especially given the pressure placed on NYPD

employees to make arrests, close cases, and secure indictments and convictions;

    d.    that the wrong choice by NYPD employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury; and

    e.    that NYPD employees had a history of making wrong choices in such matters.

165.    At the time of Plaintiff's arrest and prosecution, NYPD policymaking officials were on notice of the risk of misconduct by NYPD employees that would violate the constitutional obligations identified in ¶ 160.

166.    Policymaking officials were on notice based in part on numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division discussing the difficult issues that regularly arise for police officers during eyewitness-identification procedures and other phases of criminal investigations.

167.    Policymaking officials were also on notice based on the inherent obviousness of the need to train, supervise, and discipline police officers with respect to their constitutional obligations to counteract the pressure on such officers to close cases and to obtain arrests and convictions.

168.    Policymaking officials were further on notice based on numerous credible allegations that NYPD officers had, in violation of the constitutional obligations identified in ¶ 160:

    a.    manufactured false or unreliable identification evidence, witness statements, or other evidence;

    b.    initiated or continued the prosecutions of criminal suspects despite lacking legitimate probable cause to believe such prosecutions would result in convictions;

    c.       withheld or destroyed material exculpatory or impeaching evidence under *Brady* and *Giglio*; and

    d.       knowingly given false or misleading testimony.

169.    These unlawful practices were documented as early as July 1994, following highly publicized hearings, by the Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department—more commonly known as the "Mollen Commission Report."[1]

170.    The Mollen Commission "interviewed scores of former and current police officers and supervisors." Mollen Commission Report at 36. It found that

> [o]fficers . . . commit falsification to serve what they perceive to be "legitimate" law enforcement ends—and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested. Officers reported a litany of manufactured tales.
>
>     . . . .
>
> . . . Frustrated by what they perceive to be unrealistic rules of law and by their own inability to stem the crime in their precincts through legal means, officers take the law into their own hands. And police falsification is the result.

*Id.* at 38.

171.    The report noted: "Several officers . . . told us that the practice of police falsification . . . is so common in certain precincts that it has spawned its own word: 'testilying.'" *Id.* at 36.

---

[1] City of New York, Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, *Commission Report*, July 7, 1994, https://ia902701.us.archive.org/20/items /MollenCommissionNYPD/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

172.    In one NYPD unit, the Commission found that "the unit's commanding officer not only tolerated, but encouraged, th[e] unlawful practice" of "falsif[ying] documents" and "committ[ing] testimonial perjury." *Id.* at 39.

173.    The Commission concluded that there existed

> a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. . . . This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

*Id.* at 41.

174.    The Commission also noted that

> the Department's top commanders must share the blame. . . . We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch.
>
> Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification. . . . Internal Affairs over the last decade had no record of the number of falsification allegations brought against officers throughout the Department or in a particular precinct or command. There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, *who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics*.

*Id.* at 41-42 (emphasis added).

175.    Despite the revelations of the Mollen Commission Report, the types of constitutional violations documented in the report persisted in the following years, with little effort by NYPD policymaking officials to address them.

176.    Two detectives whose repeated misconduct NYPD policymaking officials repeatedly turned a blind eye to were Louis Scarcella and Stephen Chmil.

24

177.    In 1988, in the murder prosecution of James Jenkins, Brooklyn Supreme Court Justice Francis X. Egitto, following a hearing, found that the "pretrial identification procedures employed by [Scarcella] were unduly suggestive and prejudicial to defendant."

178.    The decision detailed how Scarcella, in violation of police practice and constitutional requirements, had shown a single photo of Jenkins to two witnesses instead of a photo array.

179.    It also detailed how, upon Jenkins's arrest, Scarcella had brought five witnesses to the precinct and conducted the following improper identification procedure:

> The witnesses were not separated prior to viewing defendant. Indeed, they were individually and collectively told by Detective Scarcella that "we arrested the man we believe was responsible for the death of the deceased; I would like you to take a look at him." After each witness individually viewed the defendant through a two-way mirror, that witness was returned to the room where his fellow witnesses waited. No effort was made to keep the witnesses from discussing their viewing of defendant who was observed, alone, in a room.

180.    The court concluded:

> The practices here utilized represent *a classic illustration of what not to do in conducting pretrial identification procedures*. It was unnecessary to display to the witnesses a single photo; no exigent circumstances justified a showup; and no argument can be advanced to support Detective Scarcella's telling the witnesses that the police had "arrested the man we believe was responsible for the death of the deceased." Based upon this *abysmal showing, and the Police's patent disregard for accepted identification procedures*, the court is left no choice but to exclude from trial all mention of such practices [emphasis added].

181.    In 1990, David Ranta was charged with murder in the high-profile shooting death of a beloved Orthodox rabbi earlier that year.

182.    Scarcella and his frequent partner Chmil were assigned to investigate the killing.

183.    At a pretrial hearing, Scarcella testified that several months after the shooting, he spoke to a man named Alan Bloom, who had been arrested near the shooting location.

25

184.    Bloom was facing numerous robbery charges and many years in prison and was incarcerated at Rikers Island.

185.    Scarcella testified that Bloom had implicated men by the names of David and Steve but did not give last names.

186.    Scarcella testified that he then located photos of David Ranta and Steve Sicar, placed them in a photo array or photo arrays, and showed them to Bloom, who identified both men as having participated in the shooting.

187.    At the hearing, Justice Egitto expressed his incredulity:

> I'm still interested when a person gets arrested, when we have a police officer who tells us the name Steve comes up and he goes ahead to the Catch Unit and picks out a picture of Ranta and Steve when nobody told him Steve's last name. I don't know if he's a medium of some kind. He also picked out the name of Ranta before anyone told him Ranta's last name. From what I gather he heard the name David. Lo[] and behold they are the right people.
>
> It stretches the credulity of the court in how these pictures are obtained.

188.    Scarcella and Chmil also manufactured at least one lineup identification of Ranta by blatantly suggesting to a witness whom he should pick.

189.    When an audio recording of the lineup came to light at trial, the defense alleged on the record that the recording established the detectives' misconduct during the lineup.

190.    Justice Egitto again admonished Scarcella, and now Chmil too, on the record:

> The more I hear this the more I am disillusioned with the work of the detectives.
>
> Here a young man of 14, 15 years of age says specifically I *think* it is number three. The cop, probably Scarcella or Chmil, says, okay, number three. From there on in the kid goes along with the number three . . . .
>
> He said, I *think* it is number three, which is not identifying any one [emphasis added].

191.    This witness later revealed that a detective had told him to "pick the guy with the big nose."

192.    Justice Egitto made the following additional remarks about Scarcella's and Chmil's conduct during the Ranta investigation:

> I think what they have done in this case, in my opinion, is decide that Mr. Ranta was the person, the guilty party, and then they went out of their way to make sure it tied up neatly in a package.
>
> . . . .
>
> [T]hey decide the case and that is the reason why a lot of our cases are being blown out when the People only have the police officers to rely upon for their statements, such as narcotics cases and gun cases. The detectives have to be taught here in New York State, unlike a lot of other places, we have a constitution. And they have to live up to it. . . . I think it is ridiculous the way cops take it upon themselves to be judge, jury, and partial executioner.
>
> . . . .
>
> I tell you this. In my opinion throughout this case the two detectives did all they could to tie it up in a neat package. . . . I don't think what they did and the manner in which they did it was, shall we say, absolutely fair.

193.    As a result of Scarcella's and Chmil's misconduct, Ranta was convicted.

194.    Despite Justice Egitto's comments, the NYPD conducted no meaningful investigation of their misconduct and took no meaningful action to discipline them.

195.    The Kings County District Attorney's Office ("KCDAO") itself moved to vacate Ranta's conviction in 2013, based on the extensive misconduct by Scarcella and Chmil that had caused Ranta's wrongful conviction.

196.    It was also known or should have been known to NYPD policymakers that in six different homicide prosecutions, Scarcella had used the false and inherently unbelievable "eyewitness" identifications of suspects by a single witness, Teresa Gomez.

197.    Scarcella knew Gomez was addicted to crack and engaged in prostitution.

198.    Using Gomez's statements and testimony that she just happened to have witnessed six murders, Scarcella made himself a hero in "solving" these homicide cases.

199.    Scarcella regularly gave Gomez money and food when he needed her to help him close cases.

200.    Gomez testified that she had witnessed, among other homicides, the September 1985 killing of Ronnie Durant, the December 1986 killing of Bruce Siblings, and the January 1987 killing of Donald Manboardes.

201.    Gomez claimed to have seen Robert Hill shoot both Siblings and Manboardes, each on a separate occasion. Gomez claimed to have seen Alvena Jennette and Darryl Austin shoot Ronnie Durant.

202.    The first of these three cases that came to trial involved the killing of Siblings.

203.    Gomez testified in that trial in 1988, saying that she had been hiding in the closet of a crack den and, looking through a keyhole in the closet door, witnessed Hill shoot Siblings.

204.    After a defense investigator testified that the closet door had no keyhole, Hill was acquitted in that case.

205.    Based upon this trial, the NYPD knew that Gomez was an untruthful and unreliable witness.

206.    Nevertheless, Scarcella presented Gomez as an eyewitness in the killings of Manboardes and Durant.

207.    At the Manboardes trial, in which Robert Hill again was a defendant, Gomez admitted she had lied at the previous trial.

208.    In addition, her testimony was contradicted by the forensic evidence.

209.    Nevertheless, Hill was convicted of the killing of Manboardes.

210.    Gomez, still in 1988, testified that she had witnessed Jennette and Austin shoot Durant.

211.    Jennette and Austin were convicted of Durant's murder.

212.    Another of the homicide cases in which Scarcella secured Gomez's testimony was dismissed during trial after Gomez failed to appear for her cross-examination.

213.    The prosecutor who conducted Hill's two trials and used Hill's testimony knew that, as he later admitted, Gomez was "ravaged from head to toe by the scourge of crack cocaine," and opined that "[i]t was near folly to even think that anyone would believe Gomez about anything, let alone the fact that she witnessed the same guy kill two different people."

214.    Yet after obtaining Hill's conviction based upon Gomez's testimony, Scarcella and this prosecutor celebrated together by smoking Scarcella's expensive cigars.

215.    Scarcella was open about his attitude, saying:  "Are there rules when it comes to homicide? No. No, there are none. I lie to them. I will use deception. The bad guys don't play by the rules when they kill Ma and Pop, shoot them in the head, ruin the lives of their family. I don't play by the rules."

216.    The KCDAO voluntarily vacated the convictions of Hill, Jennette, and Austin in 2014, after finally conceding that Gomez was an unreliable witness.

217.    In 1992, Rosean Hargrove and John Bunn were convicted of murder in a case developed by Scarcella and Chmil.

218.    The detectives' "investigation" of the underlying shooting should have raised red flags immediately based upon discrepancies in the evidence about how they came to focus on the suspects and the procedures they used to obtain identification evidence.

219.   Hargrove's and Bunn's convictions were vacated in 2015 and 2016, respectively, based largely on evidence of Scarcella's history of unlawful behavior.

220.   Upon vacating Hargrove's conviction, the hearing court summarized Scarcella's pattern of misconduct:

> The findings of this court are that *the assigned Detective, Louis Scarcella, was at the time of the investigation [in 1991] engaged in false and misleading practices*. The cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette and Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties demonstrate this *pattern and practice*. [This decision was issued before several more cases involving Scarcella were overturned.] The *pattern and practice of Scarcella's conduct which manifest a disregard for rules, law and the truth* undermines our judicial system and gives cause for a new review of the evidence.

*People v. Hargrove*, 49 Misc.3d 1208(A), at *8 (N.Y. Sup. Ct. Kings Cty. 2015) (emphasis added), *aff'd*, 162 A.D.3d 25 (2d Dep't 2018).

221.   In or about 1992, Sharon Valdez, after testifying against murder defendant Ronald Pondexter, told Pondexter's lawyer that Scarcella had coerced her into falsely implicating Pondexter by threatening to cause her to lose custody of her baby.

222.   These allegations came out in court.

223.   Valdez retook the stand but invoked the Fifth Amendment rather than recant her identification.

224.   In 1996, the Court of Appeals ordered a new trial on the ground that the trial court had not adequately considered whether to strike Valdez's testimony in light of her recantation to Pondexter's attorney.

225.   In 1993, Jewel Smith said in a sworn statement that she had identified Derrick Hamilton at his murder trial only after Scarcella secretly threatened to jail her and cause her children to be taken away if she didn't inculpate Hamilton.

226.    In 2015, the KCDAO voluntarily reversed Hamilton's conviction after concluding that Smith's identification of Hamilton, procured by Scarcella, was "incredible" and "untruthful."

227.    Detective Scarcella's partner Detective Chmil produced a witness named Jeffrey Campbell in at least one murder prosecution and by his own admission "dealt with [Campbell] a few times."

228.    Like Gomez, Campbell was addicted to crack cocaine. According to Chmil, Campbell was "a lot like" Gomez, and "[s]ometimes [Campbell would] tell you the truth, sometimes he wouldn't."

229.    In 1994, Campbell said in a sworn statement that Chmil had given him a script on which to base his testimony in the 1987 murder trial of Valance Cole.

230.    Campbell admitted giving false testimony because, after Chmil introduced him to prosecutors, Chmil promised to drop pending criminal charges against him if he testified.

231.    At his March 1997 murder trial, Jabbar Washington testified that he had falsely confessed to murder only after Scarcella physically abused him and fed him the details of the crime.

232.    Washington was convicted based on this confession and on Scarcella's testimony that an eyewitness had identified Washington in a lineup.

233.    In 2013, the KCDAO voluntarily overturned Washington's conviction after it was discovered that the eyewitness had told a prosecutor, contrary to Scarcella's testimony, that she had not identified Washington in the lineup. The KCDAO noted that Scarcella's false testimony with regard to the lineup cast doubt on his denials about having coerced Washington's confession.

234.     Also in March 1997, Sundhe Moses testified at his murder trial that he had falsely confessed to a shooting only after Scarcella physically coerced him into doing so. He was convicted based on this confession.

235.     In 2018, a state court vacated Moses's conviction based largely on the unreliability of Moses's confession in light of Scarcella's pattern of misconduct.

236.     Roger Logan was convicted in 1997 based upon eyewitness testimony developed by Scarcella that could not have been true because the eyewitness was in jail at the time—a fact that was withheld from the defense at trial.

237.     In 2014, the KCDAO voluntarily reversed Logan's conviction after concluding based on a reinvestigation that the witness's testimony "was in fact false."

238.     At her February 1998 trial, Vanessa Gathers testified that Scarcella and Chmil had intimidated her, threatened her, and fed her the details that she included in her false confession.

239.     In 2016, the KCDAO voluntarily vacated Gathers's conviction based on the unreliability of her confession, noting that her statements reflected "an acquiescence to various scenarios that were put to her" by Scarcella.

240.     Based on the above pervasive misconduct by Scarcella and Chmil—which was repeatedly detailed in judicial rulings and sworn testimony and statements before Plaintiff's arrest and prosecution in the present case—NYPD policymaking officials knew or should have known that the detectives were coercing confessions, manufacturing false or unreliable identification evidence, intentionally securing testimony that they knew to be false, giving false testimony themselves, and suppressing evidence favorable to criminal defendants which they knew they were obligated to disclose.

241.    Yet these policymaking officials failed to take meaningful steps to supervise or discipline Scarcella or Chmil to ensure that such misconduct did not continue.

242.    Instead, the NYPD treated Scarcella and Chmil as heroes for obtaining arrests and convictions at a blistering rate, thus sending a clear message to the entire NYPD police force that such misconduct would be not just tolerated but celebrated.

243.    Another of the many homicide detectives who engaged in repeated misconduct to which NYPD policymakers were deliberately indifferent was Michael Race.

244.    Race admitted in 2001 that he investigated 750 murder cases but only one was "done the correct way, from A to Z."

245.    An NYPD colleague testified that Race

> had a reputation among detectives for feeding informants and witnesses details about crimes [and] that Race had a reputation of referring informants and witnesses to the TIPS hotline so they could collect rewards for information, which is a violation of police procedure because of the risk of kickbacks.

*Blake v. Race*, 487 F. Supp. 2d 187, 204 (E.D.N.Y. 2007).

246.    Race caused both Jeffrey Blake and Ruben Ortega to be arrested and convicted on the word of a single informant produced by Race, Dana Garner.

247.    Race fed Garner the details that Garner then provided in testimony against the two men.

248.    In 1990, Garner told police he had seen Ortega murder a man; during the same meeting with police, he said he had seen Blake murder two men a week earlier.

249.    Ortega was convicted of murder in 1991 based on Garner's testimony and sentenced to 25 years to life.

250.    Blake was also convicted of murder in 1991 based on Garner's testimony and sentenced to 36 years to life.

251.    During Blake's prosecution, Garner told police that Garner's girlfriend had also witnessed Blake commit the double murder, but the police either never attempted to corroborate this or failed to disclose that the girlfriend denied having witnessed the murders.

252.    At trial, Garner tried to recant his story, but after prosecutors threatened him, he retook the stand and testified against Blake.

253.    A cousin of Garner's testified that Garner had not been in New York at the time of the double murder.

254.    Two years later, Garner signed a sworn statement saying that he had not witnessed the killings for which Blake was convicted, but he then refused to testify to this in court.

255.    Through it all, neither Race nor any other NYPD officers further investigated Garner's obviously questionable stories about the crimes he had testified to witnessing, and no NYPD policymaking officials investigated Race's obviously questionable handling of Garner as a witness.

256.    Eventually, Blake's lawyers located Garner's girlfriend, who denied having witnessed the killings.

257.    In 1998, the KCDAO conceded that Garner was an unreliable witness and consented to vacating Blake's conviction.

258.    In 1999, Garner signed a sworn statement recanting his accusations against Ortega and against another man, Timothy Crosby, whom Garner had previously accused of kidnapping him, resulting in Crosby's conviction and sentence of 10 years to life.

259.    That same year, a state judge vacated Crosby's conviction after finding Garner to be "a completely unreliable witness."

260.     In 2003, the Second Circuit vacated Ortega's conviction based on the unreliability of Garner's testimony.

261.     During civil litigation following the vacatur of Blake's conviction, Garner testified that Race had fed him the details that he repeated in his allegations and eventual testimony in the Blake and Ortega cases. He also testified that Race had threatened to charge him with crimes if he didn't implicate Blake and Ortega.

262.     Garner further testified that, during a lineup in the Blake case, a detective—he claimed he could not remember which one but knew that Race was at least present at the lineup—had told him to "just point out Jeffrey Blake." When Garner hesitated, the detective said, "I know you see him, just go ahead and point him out," and claimed Garner was "looking in [Blake's] direction . . . leaning in his direction."

263.     Despite Garner's evident unreliability as a witness and Race's reputation among his NYPD colleagues for feeding witnesses details about crimes, NYPD policymaking officials made no meaningful efforts to scrutinize Race's conduct in these investigations.

264.     Another case that illustrates the pattern of misconduct to which NYPD policymaking officials were deliberately indifferent is that of Zaher Zahrey.

265.     From 1994 to 1996, various senior detectives from the NYPD's Internal Affairs Bureau ("IAB") tried to frame Zahrey, an NYPD detective whom they suspected of being corrupt, for drug-related crimes including murder.

266.     The initially-assigned detective, Sgt. Robert Boyce, tape-recorded himself encouraging a state prisoner whom he knew to be serial robber and murderer addicted to crack, Sidney Quick, to adopt a false story Boyce suggested to him implicating Zahrey in a series of murders, robberies, and drug deals.

267.   Boyce knew the story was false because it contradicted Quick's prior statements as well as independent police investigation.

268.   Boyce improperly promised to give Quick a "very, very, very sweet deal" and to "drive [Quick] home" if, contrary to his prior statements, he'd "nail Zack to a cross" by accusing Zahrey of being present for and participating in these crimes.

269.   Later, when other IAB detectives could not corroborate Quick's manufactured claims, they convinced the United States Attorney's Office in Brooklyn to take over the case by concealing the Quick tape from it.

270.   While Quick was refusing to cooperate with the federal authorities, the assigned IAB detective worked with a prosecutor from the KCDAO, Teresa Corrigan, to use secret coercion and under-the-table promises to induce Quick into agreeing to testify.

271.   Zahrey ultimately was acquitted after Boyce's investigative misconduct was exposed, but not until he had spent nearly nine months in jail on the false charges.

272.   Zahrey also was acquitted by an NYPD administrative judge who found that Boyce had led Quick to manufacture false allegations, a finding that was ratified by the Police Commissioner.

273.   Zahrey brought a civil lawsuit alleging that Boyce and other Internal Affairs detectives and supervisors had violated his federal constitutional rights, which the City settled in or about 2010, paying a total of $2.25 million in damages and attorneys' fees.

274.   Rather than be disciplined for his misconduct in the Zahrey case, Boyce was continually promoted until he became citywide Chief of Detectives in 2014.

275.   None of the other IAB personnel involved in the Zahrey case were disciplined.

276.    NYPD detectives also committed misconduct to obtain a corrupt murder conviction in 1995 in the Jabbar Collins case.

277.    The assigned homicide detective, Vincent Gerecitano, refused to accept the denial of a witness, Edwin Oliva, who had just been arrested for an unrelated robbery, that he knew anything about the murder in question.

278.    Gerecitano detained Oliva, who was addicted to heroin, while he was going through withdrawal and was drooling, crying, exhausted, and desperate.

279.    Gerecitano coerced Oliva into signing a sworn written statement implicating Collins by refusing to summon medical assistance for Oliva while simultaneously promising him that he would assist Oliva in obtaining leniency from the KCDAO.

280.    Gerecitano omitted all these circumstances from his written report.

281.    Later, before trial, Oliva recanted his coerced written statement, but prosecutors, evidently unaware of how Gerecitano had coerced Oliva's original sworn written statement, brought in Gerecitano to pressure Oliva to recant his recantation.

282.    Ultimately, in 2010, after Collins had spent 16 years in prison, prosecutors revealed the recantation, a federal judge ordered Collins released, and all charges were dismissed.

283.    At the time of Plaintiff's prosecution, NYPD policymaking officials were on notice of numerous instances, in addition to the aforementioned cases, in which detectives improperly manufactured false or unreliable identifications.

284.    After the arrest of Kareem Bellamy in 1994 for a stabbing death, NYPD Detective John Gillen conducted a lineup that included Bellamy.

285.    The only known eyewitness could not positively identify Bellamy.

286.    The detective took the witness into a private room for an improper private meeting, after which the witness suddenly claimed to be certain that Bellamy was the perpetrator.

287.    The witness's identification of Bellamy was a significant cause of Bellamy's conviction at trial. He was incarcerated for 14 years before his conviction was overturned and the charges against him dismissed.

288.    In 1996, the same Detective Gillen conducted a lineup in the investigation of Emmett Wheaton for a robbery.

289.    At the lineup, Wheaton heard Gillen saying to the witness, "Is it number four?  Is it number four?  Is it number four?"

290.    The witness picked out Wheaton (no. 4) and he was arrested and charged.

291.    Wheaton was acquitted at trial, but only after spending almost a year in jail.

292.    In 1999, NYPD detectives brought Jason Chambers, who had witnessed a murder, to view a lineup containing suspect Pierre Jenkins. Chambers picked Jenkins.

293.    The next year at a pretrial hearing, Chambers testified that he had picked Jenkins only after the detectives had told him:  "you got to pick somebody. It was like, you got to get him. Pick somebody."

294.    Chambers then recanted his identification of Jenkins.

295.    Asked why he had picked Jenkins originally, Chambers said:  "Because the detectives were, like, you had to pick somebody. I just wanted to go home and they were just, like, forcing me to pick somebody."

296.    After Chambers's recantation, prosecutors dropped the murder charges against Jenkins.

297.    In 1999, NYPD detectives investigating a deadly shooting conducted a lineup containing suspect Ronald Ambrose.

298.    Witness Edgar Rivera had, within an hour of the shooting, identified another man as the perpetrator.

299.    Rivera viewed the lineup containing Ambrose and did not identify Ambrose.

300.    Detective Jose Rosario then took Rivera into an office at the police precinct. Approximately 20 minutes later, Rosario and Rivera returned, and Rivera positively identified Ambrose as one of the shooters.

301.    After this identification, Ambrose was indicted for murder.

302.    Based on independent exculpatory evidence, Ambrose was acquitted at trial, but only after having served over two years in pretrial detention.

303.    These allegations were known to the NYPD by 2004 at the latest, when Ambrose filed a federal lawsuit against Rosario, other detectives, and the City of New York.

304.    In 2005, Detective Robert Moscoso arrested Julio Negron on suspicion of shooting Mervin Fevrier, although no one had yet identified Negron as the shooter.

305.    In a highly improper procedure, Detective Moscoso brought one eyewitness before Negron for a show-up while Negron was in a cage in the police precinct; despite the extreme suggestiveness of this procedure, the witness looked at Negron and said, "That's not the shooter."

306.    Detective Moscoso then held Negron for approximately 24 hours longer before putting him a lineup.

307.    Three other eyewitnesses viewed the lineup and, not recognizing Negron as the shooter, either selected fillers or selected no one.

308.    Fevrier, the shooting victim, viewed the lineup and made an equivocal statement about whether he recognized Negron as the shooter.

309.    The case detective then showed Fevrier a lineup report that identified Negron, in capital letters, as the police "SUSPECT," and took Fevrier into a private room, from which defense counsel was excluded, spoke to Fevrier for at least 15 minutes, and emerged from the room and declared that Fevrier was now certain that Negron was the shooter.

310.    At a suppression hearing in 2005, the hearing court suppressed Fevrier's lineup identification based on three findings regarding Detective Moscoso's improper conduct: (1) Detective Moscoso lacked probable cause to arrest Negron and place him in a lineup; (2) the lineup itself was unduly suggestive; and (3) Detective Moscoso's private meeting with Fevrier was improper.

311.    Negron spent almost 10 years in prison before his conviction was reversed and the indictment dismissed.

312.    Moscoso was never disciplined for his behavior.

313.    In 2009, Ricardo Benitez, a parolee, was arrested on suspicion of robbing a Radio Shack store.

314.    NYPD officers Raul Lopez and Frank Libretto deliberately prepared a highly suggestive lineup to ensure that Benitez was identified. Benitez appeared to be 15 to 20 years older than the fillers in the lineup, had much darker skin, was noticeably thinner, and was sickly-looking, unshaven, and disheveled, whereas the fillers all were hale and clean-cut police officers.

315.    A Queens ADA, Tina Grillo, who was present to supervise the lineup, told Detectives Lopez and Libretto that it was improperly suggestive and requested that they select new fillers, but the detectives refused.

316.    Based on this identification, a grand jury, which was not informed of the suggestiveness of the lineup, indicted Benitez.

317.    Benitez was convicted and spent almost six years in prison before his conviction was reversed and he was acquitted on retrial.

318.    Upon information and belief, in the years before Plaintiff's arrest and prosecution, in additional to the above cases, NYPD officers and detectives caused numerous additional false arrests, prosecutions, and convictions by improperly manufacturing false or unreliable identifications and other evidence and by giving false or misleading testimony.

319.    In none of the numerous instances of misconduct by NYPD employees listed above did NYPD policymaking officials meaningfully supervise or discipline the NYPD employees in question.

320.    Evidence from recent years shows that the NYPD's deliberate indifference to constitutional violations by police officers persists.[2]

321.    In 2014, a court dismissed attempted murder charges against Tyrone Brown after an eyewitness who had viewed a lineup revealed that she had first picked out a filler, but then, after one of the NYPD detectives conducting the lineup sighed and told her to take her time, changed her answer and picked the defendant, which elicited a nod from the two detectives in the room.

322.    The witness revealed that, in fact, she still believed that the original person she picked was the shooter.

---

[2] Post-incident evidence is relevant to a claim of municipal liability as it may "shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989); *see also Henry v. Cty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.").

323.    The problem of "testilying" documented by the Mollen Commission Report has also been permitted, during the ensuing years, to continue to fester, as the *New York Times* recently documented.[3]

324.    The *Times* reported that there were "more than 25 occasions since January 2015" in which "judges or prosecutors determined that a key aspect of a New York City police officer's testimony was probably untrue." The article noted that these cases represented "almost certainly only a fraction" of the actual instances of testilying, since "a vast majority of cases end in plea deals before an officer is ever required to take the witness stand."

325.    The article highlighted two cases where "officers appear to have given false accounts about witness identifications."

326.    A current 10-year veteran of the NYPD, when interviewed by the *Times*, stated: "There's no fear of being caught . . . . You're not going to go to trial and nobody is going to be cross-examined."

327.    The *Times* reported that "[s]everal uniformed patrol officers said they have long suspected that the track record of plainclothes anti-crime teams for making weapons and drug arrests was bolstered by illegal searches and a tolerance for lying about them."

328.    In a follow-up article, the *Times* reported that, out of 81 cases in which the Civilian Complaint Review Board ("CCRB") had found that an NYPD officer had made a false statement and the NYPD had reported some response to the finding, NYPD policymaking officials had disciplined officers in only two of the cases.[4]

---

[3] *See* Joseph Goldstein, *'Testilying' by Police: A Stubborn Problem*, N.Y. Times, Mar. 18, 2018, https://www.nytimes.com/2018/03/18/nyregion/testilying-police-perjury-new-york.html.

[4] *See* Joseph Goldstein, *Promotions, Not Punishments, for Officers Accused of Lying*, N.Y. Times, Mar. 19, 2018, https://www.nytimes.com/2018/03/19/nyregion/new-york-police-perjury-promotions.html.

329.    The CCRB told the reporter that, in addition to these 81 cases, the CCRB had made findings of false statements in "dozens of other" cases, but the NYPD never even responded to these findings.

330.    In 2018, *BuzzFeed* reported that it had obtained NYPD files revealing that "from 2011 to 2015 at least 319 New York Police Department employees who committed offenses serious enough to merit firing were allowed to keep their jobs."[5]

331.    At least 50 of these instances of misconduct involved officers making misleading or "inaccurate" statements in official records or to grand juries, district attorneys, or internal affairs investigators.

332.    In every instance, NYPD policymaking officials who had "final authority in disciplinary decisions, assigned these officers to 'dismissal probation,' a penalty with few practical consequences."

333.    Further, NYPD policymaking officials have withheld records of such misconduct from the City's District Attorneys' Offices.[6]

334.    In addition to chronically failing to meaningfully supervise or discipline those police officers who committed the constitutional violations discussed above, NYPD policymaking officials had, before Plaintiff's trial, failed to adequately train or instruct police officers concerning their *Brady/Giglio* obligation to disclose, to the defense or to prosecutors, evidence impeaching the credibility of prosecution witnesses such as police officers, and the

---

[5] Kendall Taggart & Mike Hayes, *Secret NYPD Files: Officers Who Lie And Brutally Beat People Can Keep Their Jobs*, BuzzFeed, Mar. 5, 2018, https://www.buzzfeednews.com/article/kendalltaggart/secret-nypd-files-hundreds-of-officers-committed-serious.

[6] *See* James C. McKinley Jr., *Manhattan District Attorney Demands Access to Police Records*, N.Y. Times, July 8, 2018, https://www.nytimes.com/2018/07/08/nyregion/manhattan-district-attorney-police-records.html.

NYPD failed to supervise officers to ensure they fulfilled their obligation under the law to make such disclosures.

335.    The issue of whether to disclose various forms of impeachment material to the defense or to prosecutors regularly arises in criminal investigations and prosecutions.

336.    Nevertheless, the NYPD provided no or plainly inadequate *Brady*-related training; provided no or plainly inadequate training concerning making a record of information that was favorable to a criminal suspect or defendant; had no policies at all, or at least no policies that were adequately made known to detectives, requiring disclosure of *Brady* material; and did not discipline officers who failed their constitutional duty to disclose such information to prosecutors.

337.    NYPD policymaking officials had, before Plaintiff's trial, issued no Patrol Guide provision or other written directive to officers concerning when, if at all, to disclose impeachment information to prosecutors.

338.    Instead, in trainings given at the Police Academy, the NYPD instructed officers only that *Brady* material consists of "exculpatory evidence that tends to clear someone's guilt."

339.    The training on *Brady* given to NYPD recruits did not mention *Giglio* or instruct officers that they had a duty to disclose impeachment material to prosecutors.

340.    Without being adequately instructed or trained on this topic, police officers did not have a correct understanding of their constitutional obligations under *Brady* and *Giglio*.

341.    In a deposition in 2016, Defendant Smith himself testified that he didn't recall receiving any training as a member of the NYPD "about exculpatory evidence, what that is."

342.    The NYPD was aware that, in the Johnson/Blyden case discussed above, Defendant Smith had deliberately elicited false identifications from numerous witnesses, and

44

coerced a false confession, leading to the prosecution of three innocent individuals and delaying the identification of the actually guilty woman such that they could no longer be prosecuted.

343.    Furthermore, the Department was aware that, before Plaintiff's trial, Smith had been sued in at least two lawsuits alleging false arrest and evidence fabrication.

344.    Nevertheless, the NYPD took no disciplinary or other supervisory action to ensure that Smith would not repeat this misconduct in a subsequent case, which he then did in Plaintiff's case.

345.    Based on the above, NYPD policymaking officials knew or should have known, at the time of Plaintiff's prosecution, that NYPD employees, including Defendant Smith, were, among other things, manufacturing false or unreliable identification evidence, witness statements, or other evidence; initiating or continuing the prosecutions of criminal suspects despite lacking legitimate probable cause to believe such prosecutions would result in convictions; withholding or destroying material exculpatory or impeaching evidence under *Brady* and *Giglio*; and knowingly giving false or misleading testimony.

346.    With deliberate indifference to such misconduct, NYPD policymaking officials failed to take adequate steps to train, supervise, or discipline NYPD employees to prevent or deter such constitutional violations from occurring.

347.    This policy of deliberate indifference directly, foreseeably, proximately, and substantially caused the violations of Plaintiff's federal constitutional rights in this case and his resulting injuries.

348.    By virtue of the foregoing, Defendant City of New York is liable for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resultant injuries.

## SEVENTH CAUSE OF ACTION

**42 U.S.C. § 1983 and *Monell*. Municipal liability for the deliberate indifference of policymaking officials at the Bronx DA's Office to the misconduct of prosecutors. Defendant City of New York.**

349.    Plaintiff repeats and realleges each allegation contained in ¶¶ **1-125** as if fully set forth herein.

350.    The DA and his authorized delegates at all relevant times had final authority with respect to the management of personnel employed by or assigned to the DA's Office and the administration of that office.

351.    These officials collectively constituted a City policymaker for whose actions or omissions the City is liable.

352.    Bronx County is a subdivision of Defendant City of New York.

353.    The DA, at all relevant times, was and is an elected officer of Bronx County, and the DA's Office was and is funded out of the City's budget.

354.    The DA was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

355.    The DA and his assistant district attorneys are agents and employees of Defendant City of New York.

356.    The State of New York has provided by statute that Defendant City's constituent counties (including Bronx County), and hence Defendant City itself, are liable for torts committed by County officers and employees, such as the DA and his assistants. *See* N.Y. County Law §§ 53, 941.

357.    The City represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

358.     At the time of Plaintiff's criminal trial, he was entitled, under *Brady*/*Giglio*, to timely disclosure by the BXDA of all material information in the possession, custody, or control of the BXDA and/or of the NYPD that was favorable to the defense with respect to guilt or innocence and the credibility of significant prosecution witnesses.

359.     Nevertheless, a plethora of such information, including the information set forth in paragraphs **73.a, 73.c, 73.d, 73.e, 73.f, 78-90, and 97,** ***supra,*** which was known or should have been known by the DA's Office, was either not disclosed to the defense or was disclosed too late for the defense to make effective use of it before the grand jury that indicted Plaintiff, during bail proceedings, at the pretrial suppression hearing, at the trial, and in connection with post-trial motions.

360.     Individually and collectively, the BXDA's withholding of the above pieces of information was material to the outcome of these proceedings and resulted in Plaintiff's indictment, pretrial detention, conviction at trial, and subsequent imprisonment.

361.     An additional, substantial cause of Plaintiff's conviction was the prosecutor's rampant misconduct during his summation, which deprived Plaintiff of his constitutional right to a fair trial.

362.     From the outset of the prosecutor's summation, he improperly made emotional and inflammatory appeals to the jurors' sympathies, generally over defense objection:

> The defendant did more it [sic] than murder that night. He stole hopes and dreams and forever s[ac]red memories. Imagine that apartment, the room full of young people, all of them at a time in their lives where it was more important to fall in love, if only for a night, if it was to fall in love for a lifetime. And that man took all of that with just the pull of a trigger. . . .
>
> . . . . Demetrius Jones, Ali, age 19 lost everything. He was shot twice in the back and died on the floor of that apartment. But, his mother Vachelle Jones, she was surely shot through the heart. All of them might have been gone in an instant.

363.    He then improperly appealed to the jurors' sympathies for the key prosecution

witness, Corey Collins:

> Ali was murdered that night and it's this young man's burden and
> his misfortune to have to tell you about it. And I put to you, it is a
> responsibility and burden we wish upon no one. He was 16-years-old
> when he saw the shooter inside that living room that night[]. [S]ixteen
> years old when he lost his friend. What he has felt that night, perhaps has
> tried to avoid feeling, it's something that will take his whole life to figure
> out.

364.    At this point, the jury left for a bathroom break and the judge admonished the

prosecutor: "Don't play on the heart strings of the jury too much more. They have the idea."

365.    Ignoring this admonition, the prosecutor continued to improperly play to the

jurors' sympathies, again over defense objection:

> When you consider the credibility of Corey Collins, this witness,
> consider the journey he had to make from apartment 6E to that witness
> stand. Would anybody want to testify as to memories that can only be
> described as nightmares[?]
>
>         . . . .
>
> All [Collins's previous] convictions prove to you is that Corey
> Collins, a young man, about 20-years-old much [sic] is wasting his life.
> His whole life is ahead of him and he is squandering it.
>
>         . . . .
>
> Perhaps, the courage and maturity he has shown in coming forward
> and talking to you about the events of that night, may give him the motive,
> the force, the will to change his ways.

366.    The prosecutor falsely argued that Corey Collins had no "motive to lie" because

he had "no beef with Austin Babb," when in fact Collins had a powerful motive to lie based on

his expectation that he would receive benefits from the BXDA in exchange for his cooperation in

Plaintiff's prosecution.

367.    The prosecutor improperly argued, without any evidence of it in the record, and in contrast to basic psychological principles, that the jury should believe Collins despite his inconsistencies because "witnesses see events as a continuous motion picture," as "a continuous progression of images," "that is how witnesses form their memory," and the jurors should "bear that [in] mind when you assess [Collins's] testimony."

368.    He repeatedly, and improperly, argued about what "Austin Babb is hoping" and what the "defense is hoping," including the improper, denigrating argument that "defense is hoping, that you won't pay attention what the evidence is" but the jurors "deserve better" and should not "fall for it."

369.    Discussing the non-identifications by numerous eyewitnesses who viewed photo arrays, and the police failure to document those non-identifications, the prosecutor improperly shifted the burden away from the prosecution by telling the jury, over defense objection:

> Don't look at what is not the evidence in this case. Because that's what defense is hoping, that you won't pay attention to what the evidence is and evaluate that. . . . Don't let yourselves go there. You deserve better. You deserve your decision, whatever your decision is that is based upon the evidence.

370.    In truth, because the prosecution always bears the burden of proving the charges against the accused, lack of inculpatory evidence is a crucial consideration for a jury.

371.    After having withheld from the defense that Defendant Smith's credibility was in serious doubt because of the Johnson/Blyden case and the other settled lawsuits against him alleging similar misconduct, the prosecutor exploited this omission by vouching for Smith's integrity and assailing the defense for calling attention to Smith's various omissions.

372.    Discussing Smith's failure to document multiple identification procedures, he said, "Austin Babb is hoping that you will take all this nothing, and make it into a something. . . . Don't fall for it."

373.     A page later, he told the jury, "[D]on't put the police on trial. This is not about the NYPD."

374.     Later, he argued, "The police are not lazy here. Don't fall for that. Don't go for that distraction. Because it doesn't make any sense" given all the photos that were taken, fingerprints that were collected, diagrams that were drawn, and fingerprints that were examined.

375.     All these arguments would have been substantially undermined—and likely the prosecutor would not have dared make them—had the defense been able to present the evidence from the Johnson/Blyden case that, in the BXDA's own words, "unquestionably color[s] the integrity of the investigative work done by Detective Smith in the Babb case."

376.     The prosecutor improperly vouched for the other prosecution witnesses, arguing about the shooting victim's mother, Vachelle Jones, "she's very honest" and "[s]he was forthright with you."

377.     Improperly exploiting the court's ruling that the defense could not introduce Wade Quiah's statement to police that he had fled the party on the bicycle and crashed it on the street in front of the apartment building, the prosecutor told the jury: "Quiah Wade [sic] is not the shooter. . . . *You have nothing other than Quiah Wade's [sic] print on that bike.* And his admission that he was at the party that night." (Emphasis added.)

378.     Finally, in coming to a close, the prosecutor improperly sought to diminish the fundamental beyond-a-reasonable doubt standard: "You can't doubt everything. . . . You cannot doubt. You don't live your lives like that everyday. If you did, you would die."

379.     Individually and collectively, the above *Brady*/*Giglio* violations and summation misconduct by the BXDA deprived Plaintiff of his constitutional rights to due process and a fair

trial and to be free from unreasonable seizure and were a substantial cause of Plaintiff's constitutional injuries.

380.    Individually and collectively, these violations of Plaintiff's constitutional rights, and their causing and prolonging of Plaintiff's injuries, were directly, foreseeably, proximately, and/or substantially caused by conduct chargeable to Defendant City of New York amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to investigation and prosecution by the DA's Office under the leadership of the DA.

381.    Under the principles of municipal liability for federal civil rights violations, the DA or his authorized delegates have final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees of the DA's Office regarding their conduct in the prosecution of criminal matters, including, but not limited to, in the following areas:

> a.    their continuing constitutional obligation to timely and fully disclose material evidence and information favorable to the defense as set forth in *Brady*, *Giglio*, and their progeny; and
>
> b.    their constitutional obligation to give summations that comply with fundamental rules governing the conduct of a fair trial.

382.    The DA or his authorized delegates maintained a policy, custom, or practice of deliberate indifference to past violations by BXDA employees of these constitutional obligations, to the risk of future such violations by BXDA employees, and to the obvious need to train, supervise, and discipline BXDA employees with respect to these obligations.

383.    The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including, but not limited to, the DA and his delegates, who knew:

a.   to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b.   that such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

c.   that employees facing such issues have strong incentives to make the wrong choices, especially given the pressure the DA's Office places on prosecutors to win convictions at any cost;

d.   that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of the accused and cause him constitutional injury; and

e.   that employees of the DA's Office had a history of making wrong choices in such matters.

384.   The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon:

a.   numerous credible allegations, many substantiated by judicial decisions, that BXDA prosecutors had:

i.   failed to disclose information favorable to the defense that was required to be disclosed by the constitutions and the laws of the United States and of the State of New York; and

ii.   made arguments at trial that were so false, misleading, or otherwise improper that they deprived the defendant of due process and a fair trial; and

b.   the inherent obviousness of the need to train, supervise, and/or discipline ADAs in the aforementioned constitutional obligations to counteract the pressure that the DA's Office applied to prosecutors to obtain convictions.

385.   Robert Johnson became the DA of Bronx County in January 1989 and remained in that position until December 2015.

386.   During all times material to this complaint, the City, through its policymaker, the DA, owed a duty to the public at large and to Plaintiff to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by subordinates that violate the constitutional rights of criminal suspects or defendants and of other members of the public.

387.    However, the DA and his designees, as policymakers for the City, knowingly and intentionally breached, or were deliberately indifferent to, this duty.

388.    The deliberate indifference of the DA to the aforementioned constitutional violations is evidenced by his failure to discipline any of the prosecutors responsible for known instances of misconduct, or to refer such attorneys for disciplinary investigation by the Appellate Division's Disciplinary or Grievance Committees.

389.    Early in his tenure, the DA exhibited his indifference towards the types of misconduct identified above through his hiring and promotion of Daniel McCarthy.

390.    In 1990, a judge in Supreme Court, Queens County, found that McCarthy, who was then a supervisor in the Queens DA's Office, had personally concocted a fraudulent scheme to withhold from the defense *Brady* material in the form of a witness's cooperation agreement.

391.    The court wrote that it could not "adequately express in words its disgust" at the "charade" perpetrated by McCarthy. *People v. Steadman and Blair*, Ind. No. 3331/88 (Queens Cty. Apr. 20, 1990).

392.    Despite this misconduct, Bronx DA Johnson hired McCarthy in January 1992.

393.    In October 1992, the Appellate Division, Second Department, reviewing the *Steadman/Blair* case, wrote, "It is apparent from this record that the [cooperation] agreement was constructed [by McCarthy] so as to shield the witness and the trial prosecutor from full knowledge of the extent of the consideration given for [the witness's] testimony." *People v. Blair*, 186 A.D.2d 665, 668 (2d Dep't 1992).

394.    In 1993, the Court of Appeals wrote that McCarthy had made a "studied effort" to conceal the *Brady* material and, in an almost unprecedented fashion, excoriated him by name. *People v. Steadman*, 82 N.Y.2d 1, 7 (1993).

395.    Nevertheless, in 1994, after these court decisions exposing McCarthy's deliberate scheme to subvert *Brady*, DA Johnson promoted McCarthy to be the BXDA's *head of training*.

396.    The DA was further put on notice of his office's problem with the types of prosecutorial misconduct discussed above in the civil rights lawsuit *Ramos v. City of New York*, Index No. 21770-93 (Bronx County), which was filed on April 1, 1996, and resulted in the City of New York paying a then-record settlement of $5 million in December 2003.

397.    This settlement was widely reported.

398.    The Plaintiff in *Ramos*, like Plaintiff here, had been falsely convicted by the DA's Office as a result of multiple *Brady* violations, including the withholding of exculpatory evidence disproving that the defendant had committed any crime and impeaching the complainant's credibility, as well as the prosecutor's exploitation of her *Brady* violation during a false, misleading, and inflammatory summation.

399.    Through discovery in that case, it was revealed that the DA had never disciplined *any* prosecutor for misconduct, despite a long and lamentable history of such misconduct before he was elected and during his own tenure.

400.    After reporting on the Ramos settlement, the *New York Times* conducted its own investigation into the disciplinary practices of the DA's Office.

401.    The *Times* reported in 2004 that the office had failed to discipline prosecutors for the types of errors that had occurred in the Ramos case, and, as a result, it was criminal defendants who "pa[id] the price."[7]

---

[7] Andrea Elliott & Benjamin Weiser, *When Prosecutors Err, Others Pay the Price*, N.Y. Times, Mar. 2, 2004, https://www.nytimes.com/2004/03/21/nyregion/when-prosecutors-err-others-pay-price-disciplinary-action-rare-after-misconduct.html.

402.     Since the Ramos complaint was filed in 1996, courts have continued to find misconduct by Bronx prosecutors similar to that which was committed in the Ramos prosecution and in Plaintiff's case.

403.     Upon information and belief, virtually none of those cases has resulted in any discipline of the ADAs responsible for the reported misconduct.

404.     Before and after the Ramos settlement, the Bronx District Attorney had no employee handbook, manual, or other document setting forth any disciplinary process for the aforementioned types of prosecutorial misconduct, or potential sanctions for them, nor was any such process made known to employees in some other manner as a deterrent to such misconduct.

405.     The knowledge among BXDA prosecutors that there would be no personal consequence for violations of the due process and fair trial rights of criminal defendants, even after all the publicity surrounding the Ramos settlement, encouraged prosecutors, including Plaintiff's prosecutor, to believe that such violations would go unpunished. *See generally* Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors will be Disciplined by their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong*, 80 Fordham L. Rev. 537 (2011).

406.     In 2010, an official designated as a representative of the BXDA under Fed. R. Civ. P. 30(b)(6) testified that there was nothing in the office's standard employment agreement, employee manual, or any other document that contained any provisions concerning internal disciplining of prosecutors for misconduct in connection with their handling of criminal cases.

407.     She further testified that the DA's Office had no written policy or procedure setting forth specific rules of behavior, defining infractions of such rules—including whether punishment may be inflicted for negligence, recklessness, or deliberate indifference to

55

defendants' constitutional rights as opposed to willful, deliberate violations—or providing notice of the types of discipline that may be imposed for infractions.

408.   The sole "system" for discipline was that the DA supposedly would be told when court decisions or defense motions or appeals alleging improper behavior were received by the office, and then he supposedly would determine whether to conduct an investigation or to impose some form of discipline.

409.   There were no standards for determining when discipline would be imposed; this was left to the subjective judgment of the DA.

410.   In practice, it didn't matter, because the DA did not initiate any investigations or impose any discipline.

411.   As of 2010, the 30(b)(6) witness recalled only a single instance of formal discipline occurring during the DA's then–22-year tenure.

412.   The DA himself, deposed in 2011, testified that he could remember no instance in which he had imposed discipline.

413.   The DA also testified that the DA's Office kept no records of judicial findings of prosecutorial misconduct.

414.   The DA claimed testified that he had never had to consider disciplining a prosecutor for a *Brady* violation because, to his knowledge, no prosecutor had ever "intentionally" violated *Brady* during his tenure.

415.   This was false: during the DA's tenure, there were multiple published judicial decisions finding intentional *Brady* violations by Bronx prosecutors, including *People v. Garcia*, 848 N.Y.S.2d 137 (1st Dep't 2007); *People v. Mickel*, 710 N.Y.S.2d 70 (1st Dep't 2000) (reversing conviction where prosecutor failed to disclose "significant" Brady material); *People v.*

*Lantigua*, 643 N.Y.S.2d 963 (1st Dep't 1996); *People v. Banfield*, 599 N.Y.S.2d 227 (1st Dep't 1993); and *People v. Byfield*, 194 A.D.2d 331 (1st Dep't 1993).

416.    Upon information and belief, the lack of formal standards and lack of discipline described just above still accurately described the state of affairs at the DA's Office at the time of Plaintiff's trial in 2014.

417.    In addition to turning a blind eye to known violations of *Brady* and other fair-trial obligations, the DA followed a policy, custom, or practice of encouraging prosecutors to consciously avoid, or be deliberately indifferent to, obtaining personal possession or actual knowledge of *Brady* material—including past criminal or dishonest activities by witnesses, evidence of innocence, witness benefits, prior inconsistent statements by witnesses, evidence of such witnesses' motives to lie, and other impeachment material—and was deliberately indifferent to whether prosecutors discovered and disclosed such information.

418.    The BXDA had no policy under which prosecutors were required to make a record of evidence that potentially favored the defense under *Brady* and *Giglio*.

419.    The BXDA had no policy, practice, or custom under which trial prosecutors were required to thoroughly interview previous prosecutors and detectives involved in the case, and to review other records or speak with other prosecutors in the office, to find out whether exculpatory or impeachment information existed.

420.    The BXDA had no policy, practice, or custom requiring trial prosecutors (a) to review case files of the office likely to contain impeachment information concerning its NYPD witnesses who had previously been involved in cases prosecuted by the office, including evidence of the NYPD witnesses' criminal or dishonest conduct, or (b) to obtain information

about prior lawsuits brought against such officers alleging dishonest behavior, even though such

information, being in the office's possession or control, had to be disclosed to the defense.

421.    BXDA policymakers knew or should have known that, as early as 1972, the

United States Supreme Court had held that a prosecutor's office is responsible for disclosing

impeachment evidence known to members of the office even if the trial prosecutor in the given

case is not aware of such evidence: "The prosecutor's office is an entity and as such it is the

spokesman for the Government. A promise made by one attorney [or other Brady material known

to one attorney] must be attributed, for these purposes, to the Government." *Giglio*, 405 U.S. at

154.

422.    In the same 1972 decision, the Supreme Court also advised district attorneys to

adopt information-management systems that would ensure that impeachment evidence that was

known to certain prosecutors in the office would be made known and available to trial

prosecutors in other cases in which such impeachment evidence was relevant: "To the extent this

[i.e., imputing one prosecutor's knowledge of impeachment evidence to all prosecutors in the

office] places a burden on the large prosecution offices, procedures and regulations can be

established to carry that burden and to ensure communication of all relevant information on each

case to every lawyer who deals with it." *Id.*

423.    But the BXDA had no information-management system under which exculpatory

or impeachment information relating to its witnesses, including police officers with a known

history of misconduct, would be saved and made accessible to trial prosecutors using such

witnesses.

424.    BXDA policymakers knew or should have known that, in the absence of note-

taking and other records, any information management system, any requirement that trial

prosecutors interview all personnel who handled the case previously, and any requirement that they review case files of witnesses, there was a high likelihood that exculpatory or impeachment information would not be disclosed under *Brady*.

425.     The DA's Office trained prosecutors that in most cases they could get away with disclosing *Brady* material at the last minute, even during trial, because courts were loath to declare mistrials or overturn convictions due to late disclosure.

426.     The DA's Office had no written or clear policy concerning disclosure of *Brady* material at arraignment, during the grand jury process, or for consideration by the court during bail hearings.

427.     When *Brady* violations were discovered, the DA's Office almost always made procedural and various other strained and often misleading arguments in the hope that the court would do nothing, thereby communicating to line prosecutors that *Brady* violations did not matter to BXDA policymakers and would carry no consequences for the prosecutors.

428.     In addition to almost never investigating or disciplining prosecutors for *Brady* violations, the DA never did so for misconduct by prosecutors during summations, even where such misconduct resulted in appellate criticism, including reversals of serious criminal convictions.

429.     For example, in 2010 in *People v. Ortiz*, the Appellate Division vacated a burglary conviction, for which the accused had been sentenced to 20 years to life, based in part on numerous unpreserved summation errors by the prosecutor, "including extensive use of defendant's prior record as evidence of criminal propensity, along with comments that defendant 'knows he did it,' and that he was waiting for the jury to 'give him his razor back and let him walk out the door.'" 69 A.D.3d 490, 491 (1st Dep't 2010).

430.     In *People v. LaPorte*, the Appellate Division reversed a first-degree robbery conviction based on the prosecutor's pervasive summation misconduct. The prosecutor began his summation with an improper "ad hominem attack on defense counsel and ridicule of the defense theory" and "persisted with this theme throughout, repeatedly characterizing the defense theory as 'mumbo jumbo' and describing defense counsel's remarks as 'double talk,'" and "also warn[ing] the jurors several times in so many words that defense counsel was manipulating them and trying to prevent them from using their common sense." 306 A.D.2d 93, 95 (1st Dep't 2003).

431.     The prosecutor in *LaPorte* also made extensive improper argument regarding "the proper respect owed [the complaining witness] by the jury due to his status as a veteran of the Second World War," referring to him as "a war hero" who "fought in combat," and arguing that "[h]e certainly didn't go through combat to be called a doddering fool who can't make an I.D." *Id.*

432.     Further, the prosecutor "impermissibly shifted the burden of proof from the People to the defendant by posing certain rhetorical questions to the jury," such as, "'You didn't hear anything from [any defense witnesses] that that's not how the crime happened, did you?'" and, "'If there were lineup experts to give you, why didn't they give you one? They put on a case. You want lineup experts, call one.'" *Id.* at 96.

433.     "[D]espite the 'elementary rule' that a criminal defendant's general character may not be made an issue unless he chooses to make it so by putting in affirmative proof of good character . . . , the prosecutor urged the jury to infer from his homelessness that defendant chose to live on the streets so that he could fulfill his propensity to commit crime." *Id.* at 96-97. "The prosecutor also more than once referred to defendant, inappropriately, as a predator." *Id.* at 97.

434.     Other appellate decisions reporting summation misconduct by BXDA prosecutors that resulted in no investigations or discipline by the DA include but are not limited to the following:

a.     *People v. Council*, 52 A.D.3d 297 (1st Dep't 2008) (prosecutor "improperly argued that defendants' refusal to speak to [law enforcement] was evidence of their guilty intent," a blatant violation of the right against self-incrimination);

b.     *People v. Esquivel*, 46 A.D.3d 394 (1st Dep't 2007) ("prosecutor's comments during her opening statement and summation should have been avoided, including her unnecessary emphasis on the fact that the incident took place on Christmas and a few months after the September 11, 2001 terrorist attacks");

c.     *People v. Aguilar*, 14 Misc. 3d 1 (App. Term, 1st Dep't, 2006) ("improper and inflammatory remarks in summation," including "persistently attempt[ing] to improperly shift the burden of proof by (1) stating that he had an 'ethical obligation to proceed only against the defendant[s] who are guilty;' (2) implying that defendant has an obligation to introduce evidence when he argued to the jury 'don't allow the defendant to come in here and shift the blame, he's the one on trial;' and (3) commenting on defendant's pretrial silence," as well as "blatantly vouch[ing] for the credibility of his witnesses . . . , referr[ing] to matters not in evidence, and s[eeking] to 'lead the jury away from the issues by drawing irrelevant and inflammatory conclusions which had a decided tendency to prejudice the jury,' against defendant");

d.     *People v. Fuentes*, 19 A.D.3d 167 (1st Dep't 2005) ("prosecutor made several inappropriate comments");

e.     *People v. Javier*, 12 A.D.3d 192 (1st Dep't 2004) ("prosecutor made several inappropriate comments");

f.     *People v. Taylor*, 1 N.Y.3d 174 (2003) (misconduct by prosecutor, including in summation, "was indefensible");

g.     *People v. Olivero*, 272 A.D.2d 174 (1st Dep't 2000) (reversing conviction based on prosecutor's "mischaracterization" in summation of the import of the defendant's stipulation that substance introduced in evidence was heroin);

h.     *People v. Ramos*, 216 A.D.2d 250 (1st Dep't 1995) (reversing murder conviction where prosecutor "improper[ly] attempt[ed] to bolster the

prosecution's case" in summation by improper references to a detective's interviews of unknown, non-testifying witnesses);

i.  *People v. Mudd*, 184 A.D.2d 388 (1st Dep't 1992) (prosecutor's summation was "directly contradictory to the evidence, prejudicial and entirely outside the bounds of acceptable rhetorical comment"); and

j.  *People v. McReynolds*, 175 A.D.2d 31 (1st Dep't 1991) ("prosecutor exceeded permissible bounds by calling the defense counsel's arguments 'worthless,' and vouching for his argument that the defense was a fabrication" by stating, "'There is a lot of fabrication going on in this courtroom but it is not coming from the witness stand, I swear to you.'").

435.    The result of the DA's indifference to such misconduct was widespread awareness among BXDA prosecutors that all the DA cared about was winning and that misconduct during summation would be tolerated or ignored.

436.    The DA's policy, custom, and/or practice of approval, ratification of, or deliberate indifference to, violations by Bronx prosecutors of their constitutional obligations to afford criminal defendants a fair trial foreseeably encouraged such violations to continue.

437.    The aforesaid policies, procedures, regulations, practices, and/or customs of Defendant City were collectively and individually a substantial factor in bringing about the aforesaid violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his damages.

438.    By virtue of the foregoing, Defendant City of New York is liable for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resultant injuries.

## DEMAND FOR DAMAGES

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.  compensatory damages for loss of liberty, past and future mental and emotional distress, and economic harm of not less than $20,000,000;

b.  punitive damages of not less than $10,000,000;

c.      reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;

d.      pre-judgment interest as allowed by law; and

e.      such other and further relief as this Court may deem just and proper.

/s/ Joel B. Rudin
JOEL B. RUDIN
JACOB LOUP
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com

*Attorneys for Plaintiff*

Dated:     New York, New York
October 21, 2021